UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

|  |  |
|---|---|
| BARRY LAW, | |
| Plaintiff, | |
| v. | No. 08-CV-675 BRB/WPL |
| NEW MEXICO STATE UNIVERSITY, | |
| Defendant. | |

ORDER GRANTING DEFENDANT'S RENEWED MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFF'S RENEWED MOTION FOR
SUMMARY JUDGMENT

BALDOCK, Circuit Judge.[*]

In August 2001, Plaintiff Barry Law (Law) became Director of the Transportation and Equipment Services Shop (TESS) within the Office of Facilities and Services (OFS) at Defendant New Mexico State University (NMSU). In January 2008, NMSU terminated Law's employment after an internal audit revealed a complete lack of financial control at TESS. From the outset of this controversy, Law, a once tenured employee, has obstinately asserted that NMSU violated his right to procedural due process in connection with his pre-termination hearing by refusing

_____

[*] Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit Court of Appeals, sitting by designation pursuant to 28 U.S.C. § 291(b).

to explain the evidence against him and provide him a meaningful opportunity to respond.  The entirety of the record, however, belies Law's claim such that no reasonable jury could return a verdict in his favor.  Accordingly, summary disposition adverse to Law's sole federal claim is now appropriate.[1]

Under Fed. R. Civ. P. 56(c), the Court may properly grant NMSU's renewed motion for summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law."  In

---

[1] NMSU belatedly raises the question of whether Law has named the proper defendant(s) in this matter.  NMSU points out that N.M. Stat. Ann. § 21-8-3 expressly provides only for suit against NMSU's five-member Board of Regents, rather than against the University itself.  NMSU further points out that before the Board of Regents (or NMSU for that matter) may be held responsible under 42 U.S.C. § 1983 for an unconstitutional policy, custom, or practice, an individual decision maker must be held responsible for the implementation of such policy, custom, or practice.  NMSU's position is not without some force because, as a general rule, before a governmental entity may be held liable for a constitutional violation under § 1983, individual liability must attach to the underlying substantive claim.  See, e.g., Brockington v. City of Sherwood, 503 F.3d 667, 674 (8th Cir. 2007).  Of course, Law has not sued the Board of Regents or those University officials that in the first instance decided NMSU should terminate Law's employment.  Nonetheless, even if this Court is mistaken in its decision to proceed in the absence of all interested parties, "it does not by that token deprive itself of the power to adjudicate as between the parties already before it."  Fed. R. Civ. P. 19 Advisory Committee Notes, 1966 Amendment.  Surely after months of litigation without objection, NMSU has submitted itself to the jurisdiction of the Court.  While the Court acknowledges its inability to adjudicate this matter as to any absent defendants in the sense of res judicata or claim preclusion, the related doctrine of collateral estoppel or issue preclusion is sufficient to preclude Law from pursuing his procedural due process claim, on which he suffers an adverse determination today, against presently unnamed defendants in a subsequent action.  See Burrell v. Armijo, 456 F.3d 1159, 1172 (10th Cir. 2006).

2

determining whether a genuine issue of material fact exists, the Court views the evidence in a light most favorable to the opposing party. But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Considering the evidence "through the prism of the substantive evidentiary burden," id. at 254, the Court must determine "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed." Improvement Co. v. Munson, 81 U.S. 442, 448 (1872); accord Missouri Pac. R.R. Co. v. Kansas Gas & Elec. Co., 862 F.2d 796, 798 (10th Cir. 1988). Further, the Court notes that Law's renewed cross-motion for summary judgment does "not automatically empower the court to dispense with the determination whether questions of material fact exist." Missouri Pac. R.R. Co., 862 F.2d at 799 (internal quotations omitted). "When the parties file cross motions for summary judgment, [the Court is] entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to material facts." Atlantic Richfield Co. v. Farm Credit Bank, 226 F.3d 1138, 1148 (10th Cir. 2000) (internal quotations omitted).

## I.

The record evidence, none of which Law challenges as inadmissible, reveals that an internal audit of TESS occurred in 2007 as part of a broader investigation of

OFS spawned by allegations of fraudulent activity in the Construction Shop.  NMSU officials expanded the scope of the audit/investigation to determine whether internal control issues were isolated within or pervasive throughout OFS.  Law acknowledges "openly" cooperating with the auditors during the process, providing them information and feedback regarding TESS's internal operating procedures.  Law Aff. at 2.  In November 2007, prior to NMSU placing Law on administrative leave, Susan Grotevant, an Assistant Vice President of Business and Finance appointed to oversee the OFS audit, shared some of the audit report's preliminary findings regarding TESS with Law and provided him an opportunity to respond to those findings. Those findings indicated the complete absence within TESS of internal controls designed to ensure the proper and effective management of work orders.

The audit report found that TESS was making an inordinate number of work order adjustments.  In fiscal year 2006, TESS made 3,786 adjustments amounting to $8,395,240.  As of May 25, 2007, TESS for the fiscal year 2007 had made 2,431 adjustments totaling $19,873,755.  The report also found that rather than using a standard lease rate, TESS was improperly charging indirect services and supplies to work orders as direct materials:

> While examining OFS standard rate and direct materials charges, we noted that a large volume of [TESS] charges relating to indirect services/supplies were inappropriately charged as direct materials. One reason for doing this according to [Law] was that the standard rate was too low to recover actual costs and the process used at OFS to approve and implement standard rate increases was too difficult and lengthy.

Preliminary Audit Findings–Observation 13.  Among a myriad of other findings, the report found that TESS was failing (1) to consistently charge job related costs to job work orders; (2) to close work orders in a timely manner; (3) to maintain documentation supporting work order charges; and (4) to utilize procedures in the management of equipment usage to ensure the integrity of accounting records and supporting documentation.  According to a memo from Agustin Diaz, Jr., Director of Employee Relations, to Law's attorney, NMSU Audit Services was in contact with Law during the course of the audit to discuss all these matters.  Diaz Memo (March 3, 2008).  The audit report attributed the cause of TESS's operational shortcomings to a host of management-related ills and issued a lengthy list of recommendations "to mitigate or reduce the related risk to an acceptable level."  Preliminary Audit Findings–Recommendations.

In his response to the audit report's preliminary findings, Law made no material objections, though he denied telling auditors that standard rates were too low to cover actual costs.  In his deposition, Law stated he did not perceive the report's findings as exposing "per se, problems" at TESS:  "We've been operating the same way for over six years and nobody has ever said a word.  And the auditors came in, had a different perspective of how things should be run, and I agreed with them."  Law Dep. at 21.  Law, however, admitted billing errors attributable at least in part to poor work order management.  Law acknowledged "maintenance [was] being charged on leases where maintenance was not supposed to be charged."  Law

5

Dep. at 22.  Nevertheless, when Law's secretary raised the problem of overbilling with him prior to the OFC investigation in early 2007, Law responded that he was "developing" a new lease template and instructed her to "[j]ust continue doing what you're doing at this time, I don't want any major alterations and changes in our methodology, because we're going to be changing them here in a few months down the road anyway."  Law Dep. at 23-24.[2]

During the audit, Law met with NMSU Senior Auditor Candace Brown in September 2007 to discuss "direct material charges billed by his department that should have been billed as standard rates."  Brown Aff. at 1.  Law "admitted to charging some of his services and equipment leases out as direct material charges that should have been billed using the standard rate."  Law further acknowledged that "[h]e unilaterally increased standard rates without following the formal process for standard rate increases and charged the new rate as a direct material charge,

---

[2]  Apparently unphased, Law added:

I might also mention, under those leases, we had absolutely no complaints from any department out there about the values, whether they were charged or not.  Nobody ever said a word from any departments, and we had hundreds of vehicles, from the senior vice president right on down, leased.  Now, if the University believes that is such a huge issue – okay? – which apparently they do, if they believe that's such a huge issue, where is the culpability of the individuals that are signing off and paying those bills?  I certainly check my electric bill, I check my water bill, I check all my bills.  Nobody else in the University checks their bills?

Law Dep. at 25.

6

because . . . it took a month or more to get standard rates established following regular procedures."  Brown Aff. at 1-2.  Law explained that some of the improper direct material charges were "in the pilot stage" and he did not have anything on which to base costs "so he was planning to wait until he had enough information to establish a standard rate that would cover the costs."  He also stated that he billed some small equipment leased to the Construction Shop as a direct material charge because "it took a long time to get equipment set up in the system."  Brown Aff. at 2.  Law acknowledged the nature of the problem with billing and indicated he was working with Grotevant to set appropriate standard rates.

During his deposition, Law also admitted to an "egregious error,"–but then backtracked–when he asked his secretary to bill the Heavy Equipment Shop for a lease on a vehicle the shop may not have been leasing.  According to Law:

> It was a means of getting funding into the motor pool operation, transportation operation.  The president was extremely bearing down on having his Fleet Management Program put together, yet we had absolutely no funding in which to do that.  So if I could get some money in from the Heavy Equipment Pool, which I was over, through leasing this vehicle to that pool–because it was being used by the pool.  And actually, it was an appropriate thing, but she didn't feel comfortable with it, so I backed away from it.

Law Dep. at 25-26.  That Law's secretary "didn't feel comfortable" with Law's request is an understatement.  In a responsive email to Law, his secretary wrote that she had given "a lot of thought" to his suggestion and concluded she could not "professionally or morally do as [Law] asked."  She told Law:  "When I make

a billing mistake they are just that, mistakes.  If you would like, I will show you how to do the billing for the vehicle and you can do it."  At that time, Law did not explain to his secretary why he believed the billing was appropriate.  Rather, he replied:  "I agree whole heartedly, I never should have even considered the idea."  Law/Karveller Email Correspondence (May 9, 2007).

The audit report's findings regarding TESS's improper billing procedures are consistent with the deposition testimony of James McDonough, a consultant retained to assist in the audit.  McDonough stated that while the audit was ongoing, a TESS employee, who wished to remain anonymous for fear of retribution from Law:

> [R]eported to me that she was told to bill certain lessees, people that were leasing vehicles from [TESS,] for not only the leases but also other services that were being rendered.  She reported to me that under the terms of the leases, the additional services, changing the oil, washing the car, changing the tires or what have you were covered under the lease and it was a double billing, and she indicated that she told [Law] that she didn't think it was proper that she should . . . do this.  And the answer she was given, at least according to her, was that [Law] said, "Do it, I'm not worried about it, and I want you to do it."

McDonough Dep. at 51-52.  And then, McDonough continued, "another employee came and confirmed exactly what that first employee said."  The second employee's report of overbilling on a federal grant was particularly troublesome:

> [A]nother employee within the OFS . . . had come to me about a double billing that had been done under a federal contract . . . , that contract was audited, it was Indian affairs or something like that.  And at the time, I said, "Well, we don't have any alternative but to pay back the federal government because the University could get in serious trouble if they come in and do a direct cost audit and this is prevalent through[out] the University."

8

McDonough Dep. at 52-53.

Grotevant confirmed she had discussed TESS's improper use of federal funds with Law during a meeting in October 2007:  "It was one of the issues raised at that meeting, and [the meeting] dealt with a series of leases where there had been charges made to departments for items that were included in the lease.  And I had become aware that at least in one case it dealt with a grant, and went into some detail [with Law] about my concern . . . that the University could be subject to disciplinary action if it's shown that they were paying more than the cost."  Grotevant Dep. at 36.  At one point during that meeting, Law asked Grotevant if he "would be terminated" over the "lease situation."  Law Dep. at 60.  Law stated Grotevant informed him that he would not be fired.  Grotevant stated she did not respond because that decision was not within her control.

On November 16, 2007, Grotevant personally delivered a memo to Law stating NMSU was placing him on paid administrative leave "due to an investigation of alleged gross mismanagement of operations and fraudulent billing practices in [TESS]."  The memo informed Law that upon completion of the "investigation," NMSU would notify him of his employment status.  Grotevant Memo (Nov. 16, 2007).  Law responded by stating "the amount was only $11,000," which Grotevant understood as referring to TESS "overcharges."  Grotevant Dep. at 34.  On December 20, 2007, the OFS audit concluded.  Two days prior, on December 18, Grotevant personally delivered to Law a "Notice of Proposed Employment Termination."  The

9

Notice stated NMSU intended to terminate Law's employment effective January 10, 2008.  The proffered bases for Law's termination were (1) "gross negligence of duties," (2) "gross mismanagement of operations," (3) "fraudulent billing practices," and (4) "abuse of privilege."  The Notice set forth the nature of the charges against Law, all of which arose out of NMSU's internal audit/investigation of TESS:

> [A]n internal investigation revealed a pattern of mismanagement and lack of integrity over an extended period characterized by:
>
> 1.   Willful disregard of internal procedures for work order system entries, including directing employees to disregard established procedures;
> 2.   Arbitrary and inconsistent direct labor/material charges without authorization and/or support;
> 3.   Erroneous and/or duplicate charges to university departments;
> 4.   Deliberate overcharging of services.
>
> You exercised abuse of privilege by directing employees to willingly disregard standard procedures in fraudulent, duplicate, and erroneous billing to university departments including those within OFS.  You failed to follow department procedures in establishing standard rates for billing purposes within [TESS].  You failed to establish and implement adequate internal controls within your department, including development of controls to monitor the distribution and use of gas keys/cards.  The findings identified indicate systemic and pervasive deficiencies and abuse within the operations under your direction.  As Director of Transportation, your actions or failure to act have resulted in substantial negligence of duties and mismanagement of operations in a breach of your fiduciary obligation to the University.

Grotevant Memo (Dec. 18, 2007).[3]

---

[3]  The OFS audit led to a "shake-up" in OFS.  Law's immediate supervisor, Steve McCarty, was reassigned before tendering his retirement and resignation.  Rich MacRorie, Executive Director of OFS, also retired after NMSU initiated a "proposed action" regarding his employment.  NMSU reassigned Benjamin Woods, Senior Vice

(continued...)

On January 4, 2008, NMSU held a "pre-action review hearing" on Law's proposed termination.  Law and his attorney, Keith Burns, attended.  Attending on behalf of NMSU were OFC Interim Director and Hearing Officer William Mack, NMSU General Counsel Bruce Kite, Human Resources Assistant Director Deborah Weir, and Human Resources Representatives Ralph Lucero and Virginia Silva.  The hearing extended over approximately one hour and forty minutes.  At the outset, Law complained that he did not understand the meaning of the previously proffered bases for his termination and did not know the information on which his proposed termination was based.

Two documents, the contents of which were prepared contemporaneously with the hearing, reflect what transpired.  The first document, entitled "Deb Weir's Memo to File," is the more detailed of the two accounts.  The second document is entitled "Meeting Minutes–Pre-Action Review Hearing" and its author is unidentified.  Weir's Memo indicates that near the beginning of the hearing, Law acknowledged that the references in the pre-termination notice to "'gross negligence of duties,'" "'gross mismanagement,'" and "'fraudulent billing'" "'may be regarding leases for vehicles.'"  Weir Memo (Jan. 4, 2008) at 1.  The Meeting Minutes meanwhile indicate Law "had a suspicion" that the charge "he was negligent . . . was regarding lease of vehicles."  Meeting Minutes (Jan. 4, 2008) at 1.  Both documents reflect that

_____

[3](...continued)
President for Planning, Physical Resources, and University Relations, from oversight of OFS.

at the hearing NMSU officials inquired about Law's conversation with his secretary regarding improper billing practices at TESS and Law's instruction to her to continue such billing for the time being.  When William Mack asked Law whether he notified his supervisor of the overbilling, Law "stated he did not notify [his supervisor] Steve McCarty at that time because [Law] figured the new lease structure was going into effect and the new rates would be more than they are currently paying even with the overcharges."  Weir Memo (Jan. 4, 2007) at 3.  Both documents also reflect exchanges about Law's meetings with Auditor Candace Brown and Vice-President Grotevant to discuss TESS's billing practices.  At the hearing, Law acknowledged "that an issue came up with the Indian programs because that dealt with federal $ rather than just state $ and [Law] stated he refunded every penny on that lease."  Weir Memo (Jan. 4, 2007) at 3.[4]

The uncontroverted affidavits of Bruce Kite and Ralph Lucero shed further light upon the contents of the hearing.  Kite stated that because Law indicated "he

---

[4] Though not particularly forthcoming, Law's hearing counsel acknowledged in his deposition that during the pre-termination hearing:

> [Q]uestions were going around about what was going on with the motor pool, and what was going on with car leases, and how did it work.  And what did you, Barry Law, do to set up this, that, or the other?  It seemed to me that they were asking questions or being critical about some ways that vehicles were used at the University and wondering what role Mr. Law had in any of that.

Counsel "remember[ed] that there were questions about billings," and the term "lease came up a lot."  Burns Dep. at 9, 12-13.

had no idea why he was being terminated," he was "given specific examples of his improper management practices such as, for example, the fact that he was double-billing for vehicles leased by his department to other University departments by adding charges for services that were already included in the standard lease rate." Kite Aff. at 1.  Another example provided to Law was that "he had continued to improperly bill other departments after his staff brought the double-billing problem to his attention, and he further admitted that he instructed his staff to continue the improper billing practice since early 2007."  Kite Aff. at 1-2.  Hearing officials also pointed out to Law that "a federal grant involving the Indian programs was improperly billed in the same fashion as the University standard leases."  Kite Aff. at 2.  In response to Law's claim that "he did not know where the information used to support the proposed action had come from," Lucero stated that during the hearing a discussion occurred about Law's conversation with Grotevant "where she had shared with him some discoveries during an audit process of [TESS]."  Lucero Aff. at 2.  Law recalled his conversation with Grotevant "about those items and acknowledged that he had asked her at that time whether the discoveries would result in his termination of employment."  Lucero Aff. at 2.

The record affidavits, depositions, and documents bearing upon the nature of Law's pre-termination hearing all support a similar version of Law's defense.  Law disclaimed responsibility for the lack of internal controls and financial accountability at TESS and therefore did not "understand" the proffered reasons underlying his

13

proposed termination.  Regarding TESS's apparently ongoing practice of billing for vehicle maintenance contrary to outstanding lease agreements, Law pointed out that (1) he had not personally benefitted from the practice, (2) such practice was well established when he became Director of TESS, and (3) no one had ever told him the practice was improper.  Moreover, Law saw no problem with overcharging on TESS's outstanding lease agreements "because he was working on new leases that would be uniform and the rate of the new leases would be higher than the current leases even with the overbilling; his justification being that people were really saving money even with the overcharges."  Lucero Aff. at 3.  Keith Burns, Law's attorney, also indicated that "the overcharge issue was a small issue," harmless in other words, because the amount of the overcharges were less than the rates anticipated under the new lease template.  Lucero Aff. at 3.  Finally, although Law persistently claimed his superiors approved his actions, he presented no testimonial or documentary evidence to support such claim.  Following the hearing, William Mack agreed to consider the matter beyond the usual 48-hour period and provide Law an opportunity to supplement the record–an opportunity of which Law failed to take advantage.  On January 17, 2008,  Mack, on behalf of NMSU, served a "Notice of Final Determination" upon Law, terminating his employment.

## II.

As the Court explained in its previous order of June 8, 2009, denying NMSU's original motion for summary judgment on Law's federal claim, due process

requires "'some kind of hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 542 (1985). "'[D]ue process' is not a technical conception with a fixed content unrelated to time, place, and circumstances. Due process is flexible and calls for such procedural protections as the particular situation demands." Gilbert v. Homar, 520 U.S. 924, 930 (1997) (internal quotations and citations omitted). Where comprehensive post-termination procedures are available, as they were to Law per § 4.05.11 of the NMSU Policy Manual (but which he rejected as a sham), a public employee dischargeable solely for cause is entitled only to a "very limited hearing prior to his termination." Id. at 929; see also Hulen v. Yates, 322 F.3d 1229, 1248 (10th Cir. 2003) (observing that the standard for a pretermination hearing necessary to satisfy Loudermill is "not very stringent" (internal quotations omitted)). In such cases, "the pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions–essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." Loudermill, 470 U.S. at 545-46. "The pretermination hearing is merely the employee's chance to clarify the most basic misunderstandings or to convince the employer that termination is unwarranted. The pretermination hearing is intended to supplement, not duplicate, the more elaborate post-termination hearing." Powell v. Mikulecky, 891 F.2d 1454, 1458 (10th Cir. 1989). Thus,

15

balancing (a) the interest of the employee in retaining his employment and the risk of an erroneous termination against (b) the interest of the government in the expeditious removal of unsatisfactory employees and avoidance of administrative burdens, the pretermination process required in the case of a tenured public employee is (1) "oral or written notice to the employee of the charges against him," (2) "an explanation of the employer's evidence," and (3) "an opportunity [for the employee] to present his side of the story." Loudermill, 470 U.S. at 546.

In its original motion for summary judgment, NMSU largely relied on the language of the December 18, 2007 "Notice of Proposed Employment Termination," the simple fact of the January 4, 2008 hearing, and the availability of post-termination procedures to argue Law had received all the pretermination process he was due. The Court concluded the Notice sufficiently apprised Law of NMSU's allegations against  him, but *cautiously* held that issues of material fact remained concerning whether NMSU informed Law of the evidence against him prior to his termination. At that stage, the Court demanded something more concrete to establish that NMSU had met its obligation to provide Law with "an explanation" of the evidence against him. The Court observed that the Notice "never explains the evidence supporting the allegations it references. The [Notice] states "an internal investigation revealed" evidence of the allegations, but the extent of [Law's] knowledge about the "investigation" is disputed, thus leaving factual issues to be decided at trial." Law v. New Mexico State Univ., No. 08-CV-675 BRB/WPL,

16

Summary Judgment Order at 8-9 (D.N.M. June 8, 2009) (hereinafter SJ Order 1).
The Court further observed that NMSU "produced some evidence indicating [Law]
may have known about problems in OFS during his cooperation with the audit.  But
the extent to which [NMSU] identified evidence of these problems as the cause of
[Law's] termination remains a disputed issue of material fact."  SJ Order 1, at 11.

In its renewed motion for summary judgment, NMSU refocuses on Law's
involvement in the TESS audit and his knowledge, *up to and through the
pretermination hearing*, of the improper billing practices that the audit/investigation
revealed.  Of the forty-five statements of fact contained in NMSU's revised
memorandum, Law disputes only nine.[5]  Notably, Law does not deny that "he had
direct input into the responses to the audit."  Proposed Finding 3.  Law does not deny
that he "was aware that there were mistakes being made in the form of billing errors
within [TESS] eleven months before his termination."  Proposed Finding 4.  Law
does not deny that he "was informed of the billing errors, but instead of correcting
the problem, he decided to allow it to continue," and "instructed his staff to keep
doing the improper billing."  Proposed Findings 5 & 6.  Law does not deny that
during the audit, he was concerned about his possible termination "because he had
allowed the lease problems to exist uncorrected since his initial discovery of the
problem."  Proposed Finding 10.  Law does not deny that he "himself brought up

_____

[5]  In his response brief, Law objects in whole or in part to proposed findings
1, 2, 7, 8, 16, 28, 33, 41, and 44.

billing errors within [TESS] when he met with Susan Grotevant." Proposed Finding 22. Law does not deny that he told Grotevant "he felt he had only overbilled in an amount of approximately $11,000." Proposed Finding 24. Law does not deny that Grotevant "was concerned, particularly about a federal grant being overbilled by [TESS]." Proposed Finding 25. Law does not deny that his attorney recalled NMSU officials raising "questions about lease agreements" and "direct billing issues" at the hearing. Proposed Findings 14 & 15. Law does not deny that William Mack asked him at the hearing "if he told his staff to stop the improper billing practice when he became aware of it." Proposed Finding 31. Law does not deny that at the hearing he indicated he "did not think that there was a big time crunch in getting the overbilling corrected on the leases because of other priorities." Proposed Finding 36. Law does not deny that his attorney at the hearing "stated that the overcharging issue was a small matter, since the amount being overcharged was less than the new rates would generate." Proposed Finding 43. Finally, Law does not deny that "[d]uring the course of the pretermination hearing, Law's explanations repeatedly were that everybody knew what he was doing and he did what he was supposed to do." Proposed Finding 45.

Law argues NMSU failed to provide any "documentation, explanation or summary of evidence against him prior to or during the January 4, 2008 hearing." Yet, Law well knew of the dire lack of financial accountability at TESS that the audit exposed, as evidenced both by his review of the audit's preliminary findings

regarding TESS work orders and by his meeting with auditor Candace Brown. Recall that during his meeting with Brown, Law "admitted" the very crux of the problem, that is, charging services and equipment leases out as direct material charges when they should have been billed using standard rates. During the audit, Law acknowledged the same problem to Grotevant and expressed concern for his job, particularly in light of TESS's improper use of federal funds. When notified that NMSU was placing him on paid administrative leave based on "fraudulent billing practices," Law's statement that "the amount was only $11,000," whether accurate or not, indicates he understood NMSU's employment action was based on billing problems at TESS–problems for which Law (perhaps among others) was undoubtedly responsible.

Law's "Notice of Proposed Employment Termination" states an "internal investigation" revealed "[w]illful disregard of internal procedures for work order system entries," "[a]rbitrary and inconsistent direct labor/material charges," "erroneous and/or duplicate charges to university departments," and "[d]eliberate overcharging of services," – points all expressed in the audit's preliminary findings and during Law's meetings with Brown and Grotevant. The Notice then proceeds to cite, among a host of other things, Law's failure to establish standard billing rates within TESS. According to the record evidence, TESS's failure to bill out services and equipment at standard rates was an ongoing topic of discussion between Law and others shortly before and throughout the audit. The Notice's mention of

19

"[a]rbitrary," "inconsistent," "erroneous" and "duplicate charges" and "[d]eliberate overcharging" are unmistakable references to the problems at TESS of which Law was well aware precisely because NMSU had kept in contact with him through its representatives. No reasonable juror could find credible Law's claim that he did not understand the evidentiary basis of the allegations against him.

Lest any doubt remain, the evidence establishes that NMSU's concern over TESS's improper billing practices was the principal topic of discussion at Law's one hour and forty minute pretermination hearing. Law objects to NMSU's statement that "extensive discussion" occurred at the pretermination hearing about "billing problems" with the "leases." Proposed Findings 28 & 33. Law conveniently overlooks the fact that the Weir Memo mentions the term "lease," or a variation thereof, nineteen times and the term "billing," or a variation thereof, sixteen times. Weir Memo (Jan. 4, 2008) at 1-4. Meanwhile, the Meeting Minutes refer to the same terms nine and thirteen times respectively. Meeting Minutes (Jan. 4, 2008) at 1-4. Moreover, Law pays no mind to the Kite and Lucero affidavits, both of which confirm an "extensive discussion" at the pretermination hearing, with the example of the abuse of a federal grant standing out, about TESS's practice of billing contrary to its lease agreements. Even Law's attorney acknowledged that the hearing discussion focused on the topics of "billing" and "leases." That NMSU adequately explained and Law well understood the charges against him is revealed moreover by his response. Law consistently discounted his responsibility for the "mess at TESS,"

20

stating that he did not personally benefit from the overbilling and that the billing practices were in place at TESS when he arrived and had been approved by his superiors.  Both Law and his attorney suggested at the hearing that TESS's practice of overbilling was harmless, or rather, "a small matter."

### III.

The Court concludes as a matter of law that under the facts presented here, Law's (1) involvement in the audit, (2) receipt of the pretermination notice, and (3) participation in the pretermination hearing met the demands of procedural due process and satisfied its objective, namely to provide an "initial check" against an erroneous decision.  Loudermill, 470 U.S. at 545.  In the words of the Tenth Circuit, "the totality of the procedures and opportunities which the University afforded plaintiff were sufficient to satisfy constitutional requirements."  Seibert v. Univ. of Okla. Health Sciences Ctr., 867 F.2d 591, 599 (10th Cir. 1989), abrogated on other grounds by Fed. Lands Legal Consort. v. United States, 195 F.3d 1190, 1195 (10th Cir. 1999).  Law "was not fired out of the blue."  Id.  Law "was not fired for reasons that he did not know," though he obviously does not believe those reasons justified his termination.  Id.  Law "was not fired without being given the opportunity to present his side of the story."  Id. (internal quotations omitted).  Pretermination "[d]ue process does not mandate that all evidence on a charge or even the documentary evidence be provided, only that such descriptive evidence be afforded as to permit [the accused] to identify the conduct giving rise to the dismissal and

thereby enable him to make a response." <u>Linton v. Frederick County Bd.</u>, 964 F.2d 1436, 1440 (4th Cir. 1992).   The pretermination process NMSU afforded Law extended well beyond that brief face-to-face encounter with a supervisor that courts have so often held satisfies due process demands where post-termination procedures are available.  <u>See</u> <u>West v. Grand County</u>, 967 F.2d 362, 368 (10th Cir. 1992).  Given the revised evidentiary record, the Court concludes that no reasonable jury could find that NMSU failed adequately to explain to Law the reasons why he was being terminated.  Nor could a reasonable jury find that NMSU failed to provided Law an opportunity to respond to such explanation of the evidence.

Accordingly, NMSU's renewed motion for summary judgment (Dkt. #65) on Law's claim that he was denied procedural due process is GRANTED.  Law's renewed motion for summary judgment (Dkt. #62) on the same claim is DENIED.  Law's remaining state law claim for breach of contract is hereby DISMISSED without prejudice pursuant to 28 U.S.C. § 1367(c).

SO ORDERED.

Entered for the Court
this 18th day of February, 2010.


Bobby R. Baldock
United States Circuit Judge
Sitting by Designation

22